Christian, J.
There was no error in the decree of the Circuit court of Carroll county in holding the second guardian responsible only for the scaled value of the Confederate currency paid to him by the first guardian. Nothing came into his hands but Confederate currency, and all that can be required of him, is to pay to his wards, the value of that currency at the time he received it from the first guardian.
But the decree appealed from, releases from all responsibility, the first guardian, and in effect declares, that the payment of Confederate currency, then greatly depreciated, to the second guardian, was in full discharge of the debt which he owed to his wards, although the fund which he received for them was in gold or its equivalent, and although he appropriated the same to his own use, and never invested it, as the law requires, for the benefit of his wards.
The record shows that the appellee, Jonathan Jennings, was appointed guardian of the appellants, in September 1857, by the County court of Carroll county. He *317 received from the administrator of their father, the sum of $791.18. Instead of investing this fund for the benefit of his wards, he used the money in the purchase of a slave for himself, according to his own admission; and he settled no account of his transactions as guardian until compelled to do so by a decree of the Circuit court of Carroll, entered in this cause in August 1866 ; nearly ten years after his qualification.
In February 1868, Jonathan Jennings, who, upon the motion of one of his sureties, had been summoned to show cause why he should not be required to give a new bond, appeared in court and admitted that he had z*eceived reasonable notice of such motion, and declined to give such bond, whereupon “the court revoked and annulled his power as guardian, and removed him from such trust and appointment” ; and declared that “ he and his sureties be released from any and all liability on his bond as soon as he shall have settled his guardian account.”
On the same day, Fielding L. Hale was appointed guardian in the place of Jennings. And on j that day (or certainly on the next), Jennings, without having settled before a commissioner of the court, any account of his transactions as guardian, paid over to Hale, the second guardian, the sum of $690 in Confederate money, and $293 in receipts and claims paid by him, making in all $983.63 ; for which Hale executed his receipt. This balance is shown by .an ex parte, statement which is filed by Jennings with his answer, showing that it was in his possession at the time the bill was filed. Hor is there any evidence to show that it was ever seen and inspected by Hale. This paper shows that the statement is made up to show the balance due on 2d' February 1863, the calculations of .interest being made to that day. So far as the record shows, Hale knew nothing of the transactions between Jennings and his wards. Ho one but Jennings could know anything on the subject, because he had never settled any account. All that the record *318 shows on that subject is, that Jennings brought to Hale a certain amount in Confederate money, and claims paid by him, for which Hale executed his receipt; not a receiptin full, but simply a receipt for the aggregate amount. For aught that appears, Hale, the second guardian, knew nothing of the kind of currency which Jennings, the first gnardian, had received. So far as he knew, the Confederate currency paid to him had been received by Jennings in the due execution of his trust. There was, therefore, no error in the decree of the Circuit court which held the second guardian responsible for the scaled value of the Confederate currency at the date of the payment to him, charging him with that amount with interest from that date.
But under the decree entered by the Circuit court of Carroll, the first guardian, who received for his wards the sum of $791, which he, by his own confession, converted to his own use, is released from all liability, and the wards, instead of receiving the sum of $791, with interest from the 5th day of March 1858, .to which they are justly entitled, are to receive under this decree, only $177, with interest from the 2d day of February 1863.
This decree, so manifestly inequitable and grossly unjust to the wards, is sought to be maintained upon the ground, that the first guardian is released from all liability, by the second section of the act passed March 3d, 1866, known as the “ adjustment act.” That section is in these words : “ 2. "Whenever it shall appear that any such contract was, according to the true understanding and agreement of the parties, to be fulfilled and performed in Confederate States treasury notes, or was entered into with reference to said notes as a standard of value, the same shall be liquidated and settled by reducing the nominal amount due or payable under such contract in Confederate States treasury notes, to its true value at the time they were respectively made and entered into, or at such other time as may to the court seem right in the *319 particular case; and upon the payment of the value so ascertained, the party bound by such contract shall be forever discharged of and from the same : provided, that in all cases where actual payment has been made of any sum of such Confederate States treasury notes, either in full or in part of the amount payable under such contract, the party by or for whom the same was paid, shall have full credit for the nominal amount so paid, and such payment shall not be reduced.”
It is insisted by the learned counsel for the appellees, that the payment of Confederate States treasury notes by the first guardian, to the second guardian in February 1863, was such a payment, as under the proviso above recited, entitled him to have full credit for the nominal amount so paid. It is clear that the act of March 3d, 1866, can have no application, and never was intended to apply, to a case like the one under consideration, but was enacted to give relief in a class of cases totally different. The title of the act and all its provisions show this. It is entitled <e an act for the adjustment of liabilities accruing under contracts and wills made between the 1st of January 1862, and the 10th day of April 3865.” It .is only to such contracts as were made and entered into between the times inferred to, that the statute is to be applied. But in addition to this, it must appear that it was the true understanding and agreement of the parties to the contract, that it was to be fulfilled and performed in Confederate States treasury notes, or was entered into with reference to said n otes as a standard of value. Where under et such a contract ” there has been an actual payment, the party shall have ee full credit for the nominal amount so paid.”
To bring a case within the operation of this statute, three things must concur. First. There must be parties capable of making a contract. Second. It must be a contract made and entered into between the 1st day of January 1862, and the 10th day of April 1865 ; and *320 Third. That the contract according to the true understanding and agreement of the parties was to be performed or fulfilled in Confederate States treasury notes, or Was entered into with reference to said notes as a standard of value. After giving this as the true construction of the statute (which can admit of but one construction), it is sufficient to say that, iu the case before us, the debt was contracted in the year 1858, and was-due to infants.
Eor do the eases relied upon by the counsel for the appellees furnish any authority for sustaining the 'decree-of the court below. The cases cited (Sallee v. Yeates, 1 Wash.; Walker v. Walke, 2 Wash., and other similar cases) arose under the act of 1781.
The terms and provisions of that act are very different, and far more comprehensive than the act of March 3d, 1866. While under the last named act full credit for-the nominal amount actually paid is restricted and' cautiously limited to a certain class of contracts, the act of 1781, in the broadest and most unlimited terms, provided “that in all cases where actual payments have-been made by any person or persons, of any sum or sums of the aforesaid paper currency, at any time or times, either to the full amount or in part payment of any debt, contract or obligation whatsoever, the party paying the same, or upon whose account such sum or sums have been actually paid, shall have full credit for the nominal amount of such payments; and such payments Bhall not be reduced, anything in this act, or any other act or acts, to the contrary in any manner notwithstanding.”
The decisions construing this act, so entirely different in its provisions, and embracing in its very'terms “every debt, contract and obligation whatsoever,” can have no controlling effect upon the construction of the act of 1866, which is cautiously restricted in its operation to a certain-' class of contracts.
*321 But it is further insisted that there is no evidence in the record of a fraudulent purpose on the part of Jennings, the first guardian, but that he acted in good faith, and though he paid the amount due to his wards in a depreciated currency, it was the only currency in circulation at the time, and was at that time generally received in payment of debts. The fact that parties meeting upon equal terms adjusted their debts by paying and receiving. Confederate treasury notes, when depreciated, can be no justification to a guardian to pay his oiim debt due to infants, for which he had received gold five years before. His debt was due to his wards. It is true, the second guardian was the hand which the law appointed to receive it, but the debt was due to the wards. There is nothing in the record to show that the second guardian knew that the Confederate currency paid to him had not been received in the due execution of his trust, and-that Jennings was paying his own debt of $791, due in gold, with interest from March 1858, with a currency-depreciated to nearly one-fifth of its nominal value. The fact that the second guardian gave his receipt for so much in Confederate notes, and a check which could only be collected in the same currency, certainly cannot be held to be a discharge of his debt. There is no evidence that the ex parte statement made by Jennings, and filed with his answer, showing the balance due his wards, was ever exhibited to him, and that paper is not evidence for any purpose.
It is not for this court to speculate as to the motives and purposes of the first guardian. We take the facts as we find them in the record. At February term of the County court of Carroll, Jennings appears in court and acknowledges service of a rule upon him by one of his securities, refuses to give a new bond, and as soon as a new guardian is appointed, on the very day—or certainly the next day—without settling his account before a commissioner, but upon an ex parte statement *322 made by himself, showing the balance due his wards, settles with the second guardian by paying one-fifth of what was justly due his wards. Jffow he knew that he had received $791 in sound currency. He knew that he had never invested that amount, as the law requires, for the benefit of his wards, but had used it in purchasing property for himself. He knew he was seeking to discharge this debt in a currency depreciated to nearly one-fifth of its nominal value. And then he comes into a court of equity to ask its aid in shielding him from the payment of an honest debtj due to infants, and to seek a full discharge from all liability, by throwing the lqss upon those parties who are the special objects of the protection of a court of equity.
I am of opinion that the decree of the court below ought to be reversed, and that an account should be taken of the transactions of the first guardian, in w7hich he shall be charged with the whole amount received for his wards in a sound currency, and to be credited by the scaled value of the Confederate currency at the time it was paid to the second guardian; and that he shall be charged with compound interest, and shall receive no commissions.
The other judges concurred in the opinion of Christian, J.
Decree reversed.